UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
WILLIAM B. McGRATH,                                      :
                                                         :
                Plaintiff,                          :
                                                         :
        v.                                       :   07 Civ. 11058 (SAS)
                                                         :
MICHAEL B. MUKASEY, in his official capacity as United   :   **ECF CASE**
States Attorney General, CRAIG S. MORFORD, in his official :
capacity as Acting Deputy United States Attorney General, and :
ROBERT S. MUELLER, III, in his official capacity as      :
Director of the Federal Bureau of Investigation,         :
                                                         :
                Defendants.                         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS FOR LACK OF
SUBJECT MATTER JURISDICTION**


                MICHAEL J. GARCIA
                United States Attorney for the
                 Southern District of New York
                Attorney for Defendants

                SERRIN TURNER (ST-0646)
                Assistant United States Attorney
                86 Chambers Street
                New York, New York 10007
                Tel. No. (212) 637-2701
                Fax No. (212) 637-2686
                serrin.turner@usdoj.gov

## ARGUMENT

## THE CSRA PRECLUDES JUDICIAL REVIEW
## OF PLAINTIFF'S WHISTLEBLOWER COMPLAINT

As explained in defendants' initial memorandum, the CSRA specifically excludes FBI employees from its general remedial provisions affording the right to judicial review. Instead, the statute addresses whistleblower protection for FBI employees in a special, separate provision, which does not include the right to judicial review. Under clear Supreme Court and Second Circuit precedent, it follows that judicial review of FBI whistleblower complaints is statutorily precluded. Plaintiff's opposition fails to show otherwise.

**A.     Congressional Intent to Preclude Judicial Review of FBI Whistleblower Complaints Is "Fairly Discernible" from the CSRA's Statutory Scheme**

Plaintiff first argues that defendants have failed to meet their "burden" of showing that Congress intended to preclude judicial review of FBI whistleblower complaints. (Pl.'s Mem. at 3.) Relying on *Carlyle Towers Condominium Association, Inc. v. FDIC*, 170 F.3d 301, 306 (2d Cir. 1999), plaintiff contends that agency actions are presumptively subject to judicial review and that this presumption can be rebutted only by "clear and convincing evidence." (*Id.*)

It is true that *Carlyle Towers* does so state. However, the opinion immediately clarifies that "[t]he 'clear and convincing evidence' standard in this context is not a strict evidentiary burden but may be met by a 'congressional intent to preclude judicial review [that] is "fairly discernible" in the detail of the legislative scheme.'" *Id.* (quoting *Block v. Community Nutrition Inst.*, 467 U.S. 340, 351 (quoting *Data Processing Serv. v. Camp*, 397 U.S. 150, 156 (1970))).

Such intent is indeed "fairly discernible" here. As the Supreme Court held in *United States v. Fausto*, 484 U.S. 439 (1988), an intent to preclude judicial review can be discerned where the CSRA addresses the rights of certain employees without including them in the judicial remedies made available to other employees. *Id.* at 448 ("The comprehensive nature of the

CSRA, the attention that it gives throughout to the rights of [certain] employees, and the fact that it does not include them in provisions for administrative and judicial review . . . , combine to establish a congressional judgment that those employees should not be able to demand judicial review for the type of personnel action covered by that chapter."). Because the CSRA gives special attention to the whistleblower rights of FBI employees, yet excludes them from the judicial review provisions available to other federal employees, a congressional intent to bar judicial review is "fairly discernible" here, just as it was in *Fausto*. *See Runkle v. Gonzales*, 391 F. Supp. 2d 210 (D.D.C. 2005) (CSRA precludes judicial review of FBI whistleblower complaints); *Roberts v. U.S. Dep't of Justice*, 366 F. Supp. 2d 13 (D.D.C. 2005) (same); *see also Dotson v. Griesa*, 398 F.3d 156, 169-170 (2d Cir. 2005) (holding, given that judicial employees are included within the CSRA's scheme but excluded from its judicial review provisions, that "Congress's intent to withhold CSRA review rights from judicial branch employees is discernable . . . from the structure of the CSRA.").

B.    **The CSRA's Provision Addressing Whistleblower Protection for FBI Employees Does Not Establish Any Right to Judicial Review**

As defendants explained in their initial memorandum, the CSRA's special provision addressing whistleblower protection for FBI employees – 5 U.S.C. § 2303 – does not provide FBI employees with the right to seek any review outside the Department of Justice. Rather, it contemplates a purely internal form of review, as it states that FBI whistleblower protection regulations shall be promulgated by the Attorney General. *See* 5 U.S.C. § 2303(b).

Plaintiff nonetheless asserts that § 2303 contains affirmative evidence that Congress intended to permit judicial review of FBI whistleblower complaints. Specifically, plaintiff points to subsection (c) of § 2303, which states "[t]he President shall provide for the enforcement of this section in a manner consistent with applicable provisions of sections 1214 and 1221 of this

title." These cross-referenced sections – 5 U.S.C. §§ 1214 and 1221 – refer in turn to the sections of the CSRA establishing the general remedial scheme available to other federal employees, from which FBI employees are excluded, *see* § 2302(a)(2)(C)(ii). Plaintiff argues that, since 5 U.S.C. §§ 1214 and 1221 afford a right to judicial review, the cross-referencing of these sections in § 2303(c) implies that Congress similarly intended to afford a right to judicial review to FBI employees. (Pl.'s Br. at 5-6.)

This argument is meritless. Clearly, § 2303(c) cannot be construed to provide FBI employees with the very same procedural rights granted by § 1214 and § 1221. Such a construction would defeat the whole purpose of excluding FBI employees from the CSRA's general remedial scheme in the first place. *See generally John Hancock Mut. Life Ins. Co. v. Harris Trust and Sav. Bank*, 510 U.S. 86, 94-95 (1993) (stating that a court's examination of statutory language is "guided not by a single sentence or member of a sentence, but look[s] to the provisions of the whole law, and to its object and policy") (internal quotation marks omitted).

Rather than incorporating the provisions of § 1214 and § 1221 wholesale, § 2303(c) merely states that the President shall provide for enforcement of FBI whistleblower rights "*in a manner consistent* with *applicable* provisions of sections 1214 and 1221.*" Id.* (emphasis added). As explained in defendants' initial brief, the President has delegated this responsibility to the Attorney General, and the regulations promulgated by the Attorney General comply with § 2303(c)'s directive by establishing remedial procedures that *parallel* those set forth in §§ 1214 and 1221, but that are strictly internal to the Department of Justice. (Def.'s Br. at 2-3 & n.2.) This accords with the legislative history of § 2303, which confirms that Congress expected the President to implement § 2303(c) by working through the Department of Justice, as reflected in § 2303(b)'s instruction to the Attorney General to promulgate appropriate regulations. *See* 124

Cong. Rec. 28,700 (statement of Rep. Collins) ("It is my understanding that the President, when he wants to use this authority would go to the Attorney General."); *id.* (statement of Rep. Udall) ("The President will be empowered to set up a separate system, and . . . it would be required that it go through the Attorney General."); *id.* at 28,770 (statement of Rep. Udall) ("We gave [the FBI] the special authority . . . to let the President set up their own whistle-blower system so that appeals would not be to the outside but to the Attorney General.").[1]

Moreover, § 2303(c) by its own terms states that "[t]he President" shall provide for the enforcement of the rights of FBI whistleblowers – plainly implying that the only remedial procedures available to FBI whistleblowers would be contained within the Executive Branch. As plaintiff recognizes, the President "obviously cannot create nor negate federal court jurisdiction." (Pl.'s Br. at 5.) In particular, the President obviously lacks the power to expand the reach of § 1214 and § 1221's judicial review provisions, which provide a right to judicial review only with respect to decisions of the Merit Systems Protection Board and allow appeal only to the U.S. Court of Appeals for the Federal Circuit. *See* 5 U.S.C. §§ 1214(c), 1221(h), § 7703(b). Those provisions do not establish any right to challenge a decision of the Department of Justice in federal district court as plaintiff seeks to do here. Thus, far from evidencing congressional intent to permit judicial review of FBI whistleblower complaints, § 2303(c) instead provides further evidence that Congress intended to preclude such review, as it shows that Congress saw fit to leave enforcement of § 2303 solely in the hands of the Executive.

---

[1] For the Court's convenience, the referenced pages from the Congressional Record are attached as an addendum to this brief.

**C.    Plaintiff Fails to Distinguish the Relevant Case Law, which Uniformly Supports Defendants' Position**

Finally, plaintiff has no convincing response to the case law cited by defendants in support of their motion to dismiss. Plaintiff does not even attempt to distinguish the *Runkle* and *Roberts* cases, cited above, which are directly on point and squarely support defendants' position. Instead, plaintiff merely notes that the two cases "are not binding on this Court," without grappling with their reasoning and statutory analysis. (Pl.'s Br. at 7.)

As for the Second Circuit's decision in *Dew v. United States*, 192 F.3d 366 (2d Cir. 1999) – which of course is binding on this Court – plaintiff's attempt to distinguish the case is wholly unpersuasive. Plaintiff cites the *Dew* Court's assertion that "'when a statute provides a detailed mechanism for judicial consideration of particular issues at the behest of particular persons, judicial review of those issues at the behest of other persons may be found to be impliedly precluded,'" *id.* at 372 (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984)). (Pl.'s Br. at 7.) The defendants cited this statement in their brief. (Defs.' Br. at 6.) Yet plaintiff suggests that it is somehow inapplicable here because "the FBI whistleblower statute at bar [*i.e.*, § 2303] does not provide for a 'detailed mechanism,'" but instead simply "directs the executive to develop implementing procedures." (Pl.'s Br. at 7-8.)

Plaintiff misreads the quote from *Dew*, however. It states that where a statute provides a detailed judicial review mechanism, but includes only certain employees within the provision's scope, *other* employees are impliedly precluded from seeking judicial review. Nothing in *Dew* turns on whether the statute establishes a separate "detailed mechanism" of some kind for the other, excluded employees. Indeed, the statute reviewed in *Dew* – the USERRA – does not do so. Like the CSRA, the USERRA establishes a detailed judicial review mechanism that covers most federal employees but excludes intelligence employees such as employees of the FBI. *See*

-5-

*Dew*, 192 F.3d at 372. The USERRA separately addresses the rights of intelligence employees, but not through any "detailed mechanism"; rather, the statute simply directs intelligence agencies to establish appropriate internal remedial procedures with their respective inspector general offices, just as § 2303 simply instructs the Attorney General to promulgate whistleblower protection regulations for FBI employees. *See id.* at 372-73. Hence, plaintiff's suggestion that the structure of the statute at issue in *Dew* is distinguishable from the statutory structure of the CSRA is without merit. Indeed, the *Dew* Court specifically analogized to the CSRA in its reasoning, *id.* at 373, and the Second Circuit subsequently noted that the CSRA's preclusive effect was "implied in *dictum* in *Dew*," *Dotson*, 398 F.3d at 168.

Plaintiff also attempts to distinguish *Dew* to the extent that it relies on the USERRA's legislative history, which indicates that Congress's decision to exempt FBI employees from the USERRA's general remedial scheme was based on national security concerns. Without citing any legislative history of the CSRA, plaintiff contends that there is "no similar public policy [concern] . . . in the whistleblower context." (Pl.'s Br. at 8.)

In fact, Congress' decision to limit whistleblower protection for FBI employees in the CSRA was based on precisely such concerns. Congress did not want to include FBI employees in the CSRA's general remedial scheme given the sensitive national security and law enforcement issues that might be implicated by personnel disputes within the agency. *See* 124 Cong. Rec. 28,699-700 (statement of Rep. Derwinski) ("The best argument for exclusion of the FBI is probably the exclusion in the bill of other national security agencies. The Bureau's domestic work is as dangerous and rigorous as that of the Central Intelligence Agency . . . . The FBI is a sensitive agency."); *id.* at 28,700 (statement of Rep. Livingston) ("[F]ailing to exempt the FBI, like all other security agencies, . . . could mean the end of the FBI as we know it – a

centrally administered, tightly disciplined, responsive career law enforcement agency."); *id.* at 28,770 (statement of Mr. Collins) ("Given the demanding, sensitive, and unique responsibilities of the FBI, particularly its role as the primary investigative arm of the Department of Justice, there is ample rationale for providing it as great a degree of insulation with regard to its personnel function as is practical."). Thus, just as in *Dew*, it is evident that Congress intended to bar FBI employees from obtaining any form of external review with respect to whistleblower complaints, for fear of intruding on sensitive national security and law enforcement operations.

In short, *Dew* controls this case and requires dismissal.

## CONCLUSION

For the reasons above, as well as the reasons stated in defendants' initial brief, plaintiff's complaint should be dismissed for lack of subject matter jurisdiction.

Dated: New York, New York  
      March 7, 2008

MICHAEL J. GARCIA  
United States Attorney for the  
Southern District of New York  
Attorney for Defendants

By:    */s/ Serrin Turner*  
SERRIN TURNER  
Assistant United States Attorney  
86 Chambers Street, 3rd Floor  
New York, New York 10007  
Telephone: (212) 637-2701  
Facsimile: (212) 637-2686  
Email: serrin.turner@usdoj.gov

**ADDENDUM**

| | | | | | | |
|---|---|---|---|---|---|---|
| Coughlin | Johnson, Calif. | Rhodes | Ellberg | Kemp | Rahall | |
| Crane | Jones, N.C. | Rinaldo | Fary | Krueger | Richmond | |
| Cunningham | Jones, Okla. | Risenhoover | Fish | LaFalce | Rodino | |
| D'Amours | Kastenmeier | Roberts | Flood | Latta | Roncallo | |
| Daniel, Dan | Kazen | Robinson | Flowers | Lehman | Rousselot | |
| Daniel, R. W. | Keys | Roe | Ford, Tenn. | Lujan | Rudd | |
| Danielson | Kildee | Rogers | Fraser | McCloskey | Sarasin | |
| Davis | Kindness | Rooney | Frey | McHugh | Shipley | |
| de la Garza | Kostmayer | Rose | Fuqua | McKay | Skubitz | |
| Dellums | Krebs | Rosenthal | Garcia | Mann | St Germain | |
| Derrick | Lagomarsino | Rostenkowski | Gephardt | Milford | Staggers | |
| Derwinski | Le Fante | Royball | Gibbons | Miller, Calif. | Steiger | |
| Devine | Leach | Runnels | Goldwater | Moffett | Stratton | |
| Dickinson | Lederer | Ruppe | Gonzalez | Moorhead, Calif. | Stump | |
| Dicks | Leggett | Russo | Hagedorn | | Teague | |
| Dingell | Lent | Ryan | Hansen | Moorhead, Pa. | Thornton | |
| Dornan | Levitas | Santini | Holtzman | Murphy, Ill. | Traxler | |
| Downey | Livingston | Satterfield | Howard | Neal | Tsongas | |
| Drinan | Lloyd, Tenn. | Sawyer | Huckaby | Nowak | Vander Jagt | |
| Duncan, Oreg. | Long, La. | Scheuer | Ireland | Oakar | Vanik | |
| Duncan, Tenn. | Long, Md. | Schroeder | Jenkins | Panetta | Wiggins | |
| Early | Lott | Schulze | Jenrette | Pease | Wilson, Bob | |
| Edgar | Luken | Sebelius | Johnson, Colo. | Pepper | Young, Alaska | |
| Edwards, Ala. | Lundine | Seiberling | Jones, Tenn. | Pettis | Young, Tex. | |
| Edwards, Calif. | McClory | Sharp | Jordan | Pickle | Zeferetti | |
| Edwards, Okla. | McCormack | Shuster | Kasten | Pursell | | |
| Emery | McDade | Sikes | Kelly | Quie | | |
| English | McDonald | Simon | | | | |
| Erlenborn | McEwen | Sisk | | | | |
| Ertel | McFall | Skelton | | | | |
| Evans, Colo. | McKinney | Slack | | | | |
| Evans, Del. | Madigan | Smith, Iowa | | | | |
| Evans, Ga. | Maguire | Smith, Nebr. | | | | |
| Evans, Ind. | Mahon | Snyder | | | | |
| Fascell | Markey | Solarz | | | | |
| Fenwick | Marks | Spellman | | | | |
| Findley | Marriott | Spence | | | | |
| Fisher | Martin | Stangeland | | | | |
| Fithian | Mathis | Stanton | | | | |
| Flippo | Mattox | Stark | | | | |
| Florio | Mazzoli | Steed | | | | |
| Flynt | Meeds | Steers | | | | |
| Foley | Metcalfe | Stockman | | | | |
| Ford, Mich. | Meyner | Stokes | | | | |
| Forsythe | Michel | Studds | | | | |
| Fountain | Mikulski | Symms | | | | |
| Fowler | Mikva | Taylor | | | | |
| Frenzel | Miller, Ohio | Thompson | | | | |
| Gammage | Mineta | Thone | | | | |
| Gaydos | Minish | Treen | | | | |
| Giaimo | Mitchell, N.Y. | Trible | | | | |
| Gilman | Moakley | Tucker | | | | |
| Ginn | Mollohan | Udall | | | | |
| Glickman | Montgomery | Ullman | | | | |
| Gore | Moore | Van Deerlin | | | | |
| Gradison | Moss | Vento | | | | |
| Grassley | Mottl | Volkmer | | | | |
| Green | Murphy, N.Y. | Waggonner | | | | |
| Gudger | Murphy, Pa. | Walgren | | | | |
| Guyer | Murtha | Walker | | | | |
| Hall | Myers, Gary | Walsh | | | | |
| Hamilton | Myers, John | Wampler | | | | |
| Hammer- schmidt | Myers, Michael | Watkins | | | | |
| | Natcher | Waxman | | | | |
| Hanley | Nedzi | Weaver | | | | |
| Hannaford | Nichols | Weiss | | | | |
| Harkin | Nix | Whalen | | | | |
| Harrington | Nolan | White | | | | |
| Harris | O'Brien | Whitehurst | | | | |
| Harsha | Oberstar | Whitley | | | | |
| Hawkins | Obey | Whitten | | | | |
| Heckler | Ottinger | Wilson, C. H. | | | | |
| Hefner | Patterson | Wilson, Tex. | | | | |
| Heftel | Pattison | Winn | | | | |
| Hightower | Perkins | Wirth | | | | |
| Hillis | Pike | Wolff | | | | |
| Holland | Poage | Wright | | | | |
| Hollenbeck | Pressler | Wydler | | | | |
| Holt | Preyer | Wylie | | | | |
| Horton | Price | Yates | | | | |
| Hubbard | Pritchard | Yatron | | | | |
| Hughes | Quillen | Young, Fla. | | | | |
| Hyde | Railsback | Young, Mo. | | | | |
| Ichord | Rangel | Zablocki | | | | |
| Jacobs | Regula | | | | | |
| Jeffords | Reuss | | | | | |

NAYS—4

| | | |
|---|---|---|
| Lloyd, Calif. | Mitchell, Md. | Quayle |
| Marlenee | | |

ANSWERED "PRESENT"—2

| | |
|---|---|
| Goodling | Patten |

NOT VOTING—108

| | | |
|---|---|---|
| Ammerman | Brown, Mich. | Clawson, Del |
| Applegate | Brown, Ohio | Cochran |
| Armstrong | Burgener | Cohen |
| Aspin | Burke, Calif. | Conyers |
| Beard, R.I. | Burke, Fla. | Cotter |
| Beilenson | Butler | Delaney |
| Biaggi | Byron | Dent |
| Boland | Caputo | Diggs |
| Bonker | Chappell | Dodd |
| Breaux | Chisholm | Eckhardt |

So the motion was agreed to.

The result of the vote was announced as above recorded.

IN THE COMMITTEE OF THE WHOLE

Accordingly the House resolved itself into the Committee of the Whole House on the State of the Union for the further consideration of the bill H.R. 11280, with Mr. DANIELSON in the chair.

The Clerk read the title of the bill.

The CHAIRMAN. When the Committee rose on Thursday, September 7, 1978, the Clerk had read through line 2 on page 144.

Are there any further amendments to title I of the bill?

Mr. HANLEY. Mr. Chairman, I move to strike the requisite number of words.

Mr. Chairman, as we initiate our deliberation on civil service reform today, it is my fondest hope that this legislation will move relatively smoothly and, without taking up too much time, be voted on in the Chamber at some point late this afternoon.

I would like to respond if I can briefly to some remarks on the part of my dear friend and colleague and manager of the bill, the gentleman from Arizona (Mr. UDALL), going back to Thursday night, when it was about 9 o'clock and the tempers were not that good. I would have preferred to have responded at that point but logic suggested that it was time to break it up and come back here on Monday and start anew. I have great respect for the gentleman from Arizona, Mo UDALL, and have worked closely with him from the very beginning.

I do believe, however, that the issue of civil service reform has to be put into another perspective. Certainly I know that he did not intend it that way, but the implication was that by virtue of the activity of several members of the committee that this measure was not moving and was slowed down in the committee process.

I would take issue with that implication and I would have to put it this way that any delays that have been attributed to the deliberation of this measure we have to fault the administration itself because from the very beginning the administration insisted upon expediency. As a result, that insistency agonized many, many entities, This was totally unnecessary. The implication the other evening was that everybody embraced this measure and all America was out there waiting for its enactment into law. That is not necessarily the case in its present form.

I would hope very much that certain amendments today will prevail to make this measure more palatable to most Americans.

Few disagree with the necessity for civil service reform. We all agree, and I think that this committee on the whole is committed, to reforming the civil service system. The problem happens to relate to the methodology employed by the White House in pursuit of this legislation.

As a result of which, for instance, the largest union of Federal employees, the American Federation of Government Employees, is somewhat unhappy with it. It did not have to be that way. There were compromises that could have been effected.

For instance, the American veterans' community is not happy with the legislation in this present form. It did not have to be this way at this point in time.

I could allude to a number of other entities such as the National Association of Treasury Agents, and many others, who are very unhappy with the bill. All of this was unnecessary if we could have applied sufficient deliberation to the measure but expediency was the order of the day on the part of the White House and the President, time in and time out, said that we have to have a bill this year. Well, in my judgment, if you are moving in the direction of something as complex and as broad in scope as this measure, certainly, then, it was due a decent foundation and, unfortunately, the measure that we are deliberating never enjoyed that decent foundation.

So we are going to do the best we can this day to make the measure more palatable so that we will be doing justice to the taxpayers and at the same we are not inflicting harm upon that good dedicated Federal employee.

Yes, we do have problems within our personnel complement but they are relatively few and most of the people happen to be very dedicated people who want very much to produce a day's work for a day's pay.

There are aspects of this legislation which could be unfair in this regard and we intend, through the amendment process, hopefully to effect responsible change.

The CHAIRMAN. The time of the gentleman has expired.

(By unanimous consent, Mr. HANLEY was allowed to proceed for 2 additional minutes.)

Mr. HANLEY. Mr. Chairman, we hope very much that during the course of this day, through the amendatory process, we make the measure far more palatable and far more fair to all.

Incidentally, I have the highest regard for the administration's chief technician on this measure, the Chairman of the Civil Service Commission, Allen "Scotty" Campbell, whom I regard as a great professional from the standpoint of public administration.

Unfortunately, the accelerated time frame provided the problems we have with this measure. It is unfortunate that

this situation had to prevail throughout the period of deliberation.

Therefore, Mr. Chairman, I am very hopeful that today, posthaste, but yet responsibly, we can do what has to be done to this bill so that we can say, "All right, Mr. President, here is the tool you have asked for. We are providing it for you in this 95th Congress. We would have preferred to have taken a little more time and to have done something far more responsible in the next Congress; but, in any event, we are saying, Mr. President, that this is what you have asked for; and we are going to give you the best possible bill given the environment under which we worked."

Mr. Chairman, I yield back the balance of my time.

Mr. CHARLES H. WILSON of California. Mr. Chairman, I move to strike the second from the last word.

Mr. Chairman, I do not relish the role of speaking against quick passage of the civil service legislation, H.R. 11280, perceived by many to be a good reform vote in an election year. If the stakes were not so high I suppose that we could just let this one sail by.

To put it quite bluntly most Members of the House seem to feel that anything labeled civil service reform is better than nothing.

I would have hoped that we would have learned from the ill-conceived Postal Reform Act of 1970 that that is not the case.

Indeed the similarity between this civil service bill and the 1970 postal bill is glaring.

Just as we do today, back in 1970 we had a juggernaut of forces—many totally unfamiliar with the subject matter—descending on the Hill to lobby for passage. Is it not interesting that in the past few months the Business Roundtable has sent scores of representatives to lobby the Congress on the civil service bill despite the fact these representatives when pressed for details openly admitted they did not understand the bill?

Just as we do today, back in 1970 we had a new President pushing for a dramatic "reform" bill.

Just as we do today, back in 1970 we had broad bipartisan support. Incidentally, Republicans must have wry smiles on their faces as they watch Democrats support their bill.

If President Nixon were pushing this particular bill to open so many positions to political appointees, he would have been laughed off the floor, by my Democratic colleagues. Now we are doing this for an administration which has announced through its Secretary of Agriculture that it will soon start disciplining errant congressional Democrats by removing their friends from appointed positions.

Just as we do today, back in 1970 during consideration of the Postal Reform Act the White House had a Democratic champion for the bill, ironically the same one we find today. I do not think we want to further damage Mr. UDALL's record by passing this bill, too.

Virtually every Member of the House will agree that the postal reform bill of 1970, to put it mildly, did not solve all of the troubles of the Postal Service, as passage in the House this year of corrective legislation by a 384 to 11 vote proved. We do not have to make the same mistake with civil service reform by acting in haste.

I think that it is also important to emphasize that during consideration of this bill all Members should understand that when in some cases Mr. UDALL implies certain support for this legislation he is talking about very different forms of the bill. Indeed this bill now being discussed by Mr. UDALL is not the same one approved by the Post Office and Civil Service Committee—there are substantive differences. Contrary to the implication given by Mr. UDALL, the Federal employee unions do not support this bill.

In summary, I hope that every Member of this House will realize that a bad civil service bill would not simply hurt a few of the local Washington area members with a concentration of Federal employees, it will damage every citizen's contact with every aspect of the Federal Government.

Mr. CLAY. Mr. Chairman, I move to strike the requisite number of words.

Mr. Chairman, I am pleased to announce that I have received assurances from the President that he will press for consideration and action by the other body on Hatch Act reform prior to adjournment. Accordingly, in view of President Carter's personal assurances of his intent, I deem it unnecessary to continue my effort to attach Hatch Act reform to civil service reform or to further oppose consideration of the reform measure on the House floor.

I applaud the President for his continued support to Hatch Act reform and am delighted by his assurances that he will use the powers of his office to encourage Senate consideration and action prior to adjournment. My efforts were geared to insure Senate consideration of the bill in the forthcoming House-Senate conference on civil service reform. Now, assuming that the President's efforts are successful, I feel a lessened sense of urgency for Hatch Act reform to be a part of civil service reform.

Mr. Chairman, for the consideration of my colleagues I am submitting the following letter from the President of the United States.

THE WHITE HOUSE,
*Washington, September 8, 1978.*
Hon. WILLIAM CLAY,
*Chairman, Subcommittee on Civil Service, U.S. House of Representatives, Washington, D.C.*

DEAR MR. CHAIRMAN: Early in my administration I proposed to Congress that the Hatch Act provisions affecting the political activities of federal employees be modified.

I was pleased that the House, under your leadership, voted overwhelmingly last year to strengthen the protections of federal employees from political coercion on the job while permitting them to freely exercise their First Amendment rights to participate in the political process. I continue to support Hatch Act reform.

Because I am concerned that the issues surrounding Hatch Act modification and Civil Service reform not become intertwined, I have consistently sought reform of the Hatch Act independent of action on Civil Service reform.

I believe separate consideration of the two bills is the best way to insure that each bill is eventually passed. This does not reflect any diminution of my commitment to fuller political participation for federal employees while affording necessary protections to the public. It does reflect my belief that the Hatch Act should not be considered together with Civil Service reform.

I share your concern that the Senate has not yet acted upon Hatch Act legislation, and intend to bring this concern to the attention of the Senate leadership. Hopefully, consideration and action will be taken without undue delay—prior to adjournment.

Your efforts on behalf of Hatch Act reform merit the appreciation of all federal employees anxious to exercise their basic political rights. I look forward to continuing our mutual efforts in support of those federal employees.

Sincerely,

JIMMY CARTER.

AMENDMENTS OFFERED BY MR. COLLINS OF TEXAS

Mr. COLLINS of Texas. Mr. Chairman, I offer amendments.

The Clerk read as follows:

Amendments offered by Mr. COLLINS of Texas:

On page 137, line 12 after "(ii)" insert the following: "the Federal Bureau of Investigation,".

On page 142 after line 22 insert:

(e) With regard to employees and applicants for employment in the Federal Bureau of Investigation, disclosures described in subsection (b)(8)(A) of this section shall be made to the Attorney General or his designee. The Attorney General of the United States shall issue rules and regulations to protect employees and applicants for employment in the Federal Bureau of Investigation from the taking or failure to take any personnel action as a reprisal for such disclosure.

On page 213, line 5: after "(B)" insert the following: "the Federal Bureau of Investigation,".

On page 258, line 7: strike out 10,920 and insert in lieu thereof "10,780".

On page 258, line 13: strike out "Management." and insert in lieu thereof the following: "Management, except that the Director of the Federal Bureau of Investigation, without regard to any other provision of this section, may place a total of 140 positions in the Federal Bureau of Investigation in GS-16, 17, and 18."

On page 273, line 15: after "(B)" insert the following: "the Federal Bureau of Investigation,".

Mr. COLLINS of Texas. Mr. Chairman, I ask unanimous consent that the amendments I have offered, which are related to the FBI and are to title I, title IV, and title VI, be considered en bloc.

The CHAIRMAN. Is there objection to the request of the gentleman from Texas?

There was no objection.

Mr. COLLINS of Texas. Mr. Chairman, I have offered four amendments which would insert identical provisions into titles I, IV, and VI of the bill. I asked and was given unanimous consent that they be considered en bloc.

My amendments exclude the Federal Bureau of Investigation from the bill on the same basis as the various national security agencies—the Central Intelligence Agency, the Defense Intelligence Agency, and the National Security Agency.

Title I of the bill sets forth merit system principles, but its prohibited personnel practices section would contradict the current status and flexibility of the

FBI. The Bureau has been exempted, for example, from considering alcoholics and drug abusers for employment—the Alcoholism Rehabilitation Act, Public Law 91-616, and the Drug Abuse Rehabilitation Act, Public Law 92-255—but under the merit system language of title I and a recent ruling by the Civil Service Commission defining "handicapping condition" to include alcohol or drug abuse, the FBI might have to consider for employment individuals with histories of alcoholism or drug abuse.

Existing law also limits the FBI from the purview of the Civil Service Commission in such areas as recruitment, qualification requirements, promotion and internal placement, career and career-conditional employment, and temporary assignments. Title I of the bill would allow active overview of the Bureau by the Merit Systems Protection Board and the Office of Personnel Management and affect the authority of the FBI Director to place up to 140 positions at supergrade levels in order to respond to the investigative priorities of the Justice Department.

Title IV should also exclude the FBI on the same basis as other national security agencies. The Senior Executive Service could place executives from other agencies in positions of high sensitivity in which demanding, rigorous or dangerous duties could be thrust upon them. The lives and safety of FBI personnel should not be jeopardized by the possibility of assignment of supervisory executives from other than law enforcement backgrounds.

Title VI on research and demonstration projects should exclude the FBI for obvious reasons. The Bureau is charged with the investigation of 78 different types of violations of criminal statutes relating to the integrity of Federal officials. The impartiality of such investigations is threatened by any program which makes it dependent on other agencies for its executive staffing or compels it to participate in exchanges of executives with these agencies. The bill's exclusion of the General Accounting Office is based on the same reasoning: The impartiality of GAO's Government-wide audits would be threatened.

Finally, Mr. Chairman, the bill as drafted empowers the President to exclude from coverage by the three titles "any executive agency or unit thereof which is designated by the President and which conducts foreign intelligence or counterintelligence activities," but the FBI has exclusive investigative responsibility for foreign counterintelligence activities within the United States. It is therefore unreasonable to refrain from excluding it for substantially the same reasons as for exempting the other security agencies.

Mr. Chairman, I urge enactment of my amendments.

Mr. UDALL. Mr. Chairman, I move to strike the last word.

Mr. Chairman, if I can have the attention of my friend, the gentleman from Texas, I hope maybe we can work this thing out in just a few minutes to the gentleman's satisfaction.

One of the many problems we have wrestled with in this legislation is what do we do about exempting intelligence agencies? The President's bill as originally submitted did not exempt the FBI from the bill.

I am prepared this morning to offer a substitute, and I hope to have the substitute language ready in just a moment for the gentleman from Texas (Mr. COLLINS). What my substitute will do is this—and I hope it will be acceptable to the gentleman from Texas (Mr. COLLINS) because we are giving him most of what he wants and most of what the Bureau wants—we will totally exempt the FBI from the senior executive provision of the bill. That is No. 1.

No. 2, we will exempt the FBI from the title VI experimental personnel demonstration portion of the bill which they wanted out from under.

With regard to the "whistle-blower" section, the language of the bill now permits the President to exempt the FBI from that section, and based on language submitted to us by the White House today, I think they have worked this out with the Justice Department. If the President does decide to exempt them— and he may exempt them, he will under the language of the bill be required to issue special rules and regulations so that the FBI "whistle-blowers" will be in a position to have someplace to go and so that they will have some protection. This will be done through a system to be designated by the President. This would be essentially consistent with the amendments the gentleman from Texas (Mr. COLLINS) has offered and showed me this morning.

I will have this language ready in just a moment as further discussion goes on. I hope it will be acceptable to the gentleman from Texas (Mr. COLLINS), and I hope we put this matter to rest.

I want to say that I have great regard for the FBI. This in is a fine agency, but it is an agency that has suffered some agonies in the past. I know of the concern the professional members of the FBI have about the status of their agency today, and I do not want to come out here with legislation that will disrupt them further and submit them to additional agony.

I am reluctant to start exempting agencies, because many of the Federal agencies think they are special and think they ought to have special treatment. I am going to be pretty careful about exempting any other agency, but I think the FBI has made a case for the compromise I am going to offer in just a moment, as soon as the staff gets it ready for us.

Mr. COLLINS of Texas. Mr. Chairman, will the gentleman yield?

Mr. UDALL. I yield to the gentleman from Texas.

Mr. COLLINS of Texas. Mr. Chairman, I appreciate the gentleman's yielding.

Mr. Chairman, as the gentleman knows, in our FBI present system, as far as the investigation of what they call the whistle-blowers is concerned, the present setup within the FBI involves four different places where they can go. The first one, of course, is the Inspection Staff where they have the Office of Professional Responsibility, known as the OPR.

As I understand it, in Phoenix, Ariz., in Dallas, Tex., or St. Louis, any place they live or work, they can pick up the telephone and call directly to the OPR, and in confidence they can discuss anything they want to discuss or they can make it an FBI agency matter. They have their choice of either doing it confidentially or going before FBI as a complainant.

I checked on and found out that so far this year there have been 248 citizens who reported to the FBI, to the Office of Professional Responsibility. So it is an active section of FBI. I can see why we are very aware, from the comments we have in Washington today, that we must be very certain we have all and full access for any employee.

The second referral point is that they can go to the Justice Department itself. The Justice Department has its own Office of Professional Responsibility, and that particular OPR is reporting only to the Attorney General.

Now, that was in the clarification amendment that we put into this law on the gentleman's suggestion. The gentleman from Georgia (Mr. LEVITAS) clarified this point so it now codifies the Justice Department referral. That is the way it works in practice, and it works well. It depends on a strong Attorney General, and we have a strong Attorney General.

It is interesting that last year under this provision, there was someone who reported to the Attorney General, and after a full investigation the No. 2 person in the FBI was removed. When we have a provision strong enough to remove the No. 2 executive within an agency, we do have something that is unusually strong.

Mr. UDALL. Mr. Chairman, the concern I have, if I may express this to the gentleman from Texas (Mr. COLLINS), is that the public should have confidence that there are channels within the Government so that people can "blow the whistle" on the FBI just as they can on other agencies.

We all remember our old Watergate fears, and the fear of some of our friends was that we would have been in a situation where, concerning L. Patrick Gray, if he had blown the whistle on one of his people, he would have blown the whistle and the appeal would have gone on to John Mitchell.

We want to have the President set up a channel through the agency that will satisfy most people that there is a channel available so that these matters can come forward.

Mr. DERWINSKI. Mr. Chairman, I move to strike the requisite number of words.

Mr. Chairman, I rise in support of amendments to provide certain exclusions for the Federal Bureau of Investigation.

The rigorous and dangerous duties performed by the Bureau's employees do not lend themselves to some aspects of this legislation.

The best argument for exclusion of the FBI is probably the exclusion in the bill

of other national security agencies. The Bureau's domestic work is as dangerous and rigorous as that of the Central Intelligence Agency, which the bill excludes; and because the FBI is in cnarge of investigating white collar crimes throughout the Nation, we have at least as much reason for excluding it from the personnel exchanges and experiments proposed in title VI as we have for excluding the General Accounting Office. The bill rightfully excludes the GAO in order to preserve the objectivity of its audits, but the objectivity of investigations into alleged Federal employee wrongdoing is at least as important.

Mr. Chairman, I urge support of these amendments in order to conform this bill to the laws which rightfully correspond to the FBI's unique investigative needs.

Basically, Mr. Chairman, I support the package of amendments offered by the gentleman from Texas (Mr. COLLINS), but I certainly hope that we can work out this adjustment that the gentleman from Arizona (Mr. UDALL) will offer.

There are two points here, though, that I would like to make to the Members of the House. One is that the reason I would like to see a very satisfactory adjustment of this issue of the FBI is because there has been doubt on the part of some Members on this bill and it is an honest doubt.

The FBI is a sensitive agency. We should clear up any concern over how the FBI would be influenced. We can clear up some of the concerns about the bill itself. I think the entire bill will receive more support if some of these lingering doubts—that is with regard to the FBI—are cleared up.

So in that sense, I would hope that we can work out a solution to which the gentleman from Texas and the gentleman from Arizona have provided a very positive role in adding to the momentum of this bill.

There are unique problems facing an intelligence agency such as the FBI, and I think this package of amendments is necessary to clarify any questions that we do have.

Mr. UDALL. Mr. Chairman, will the gentleman yield to me for the purpose of offering amendments as a substitute for the amendments offered by the gentleman from Texas (Mr. COLLINS)?

Mr. DERWINSKI. I yield to the gentleman from Arizona.

AMENDMENTS OFFERED BY MR. UDALL AS A SUBSTITUTE FOR THE AMENDMENTS OFFERED BY MR. COLLINS

Mr. UDALL. Mr. Chairman, I offer amendments as a substitute for the amendments.

The Clerk read as follows:

Amendments offered by Mr. UDALL as a substitute for the amendments offered by Mr. COLLINS: Page 137, after line 18, insert:

"(3) If the President does not designate the Federal Bureau of Investigation, in its entirety, under paragraph (2)(B)(11) of this subsection, functions of the Special Counsel relating to the enforcement of this section with respect to the Bureau, or any unit thereof, shall be carried out by the President (or his designee) notwithstanding any provision of law to the contrary."

Page 213, line 5, after "(B)" insert the following: "the Federal Bureau of Investigation,".

Page 273, line 15, after "(B)" insert the following: "the Federal Bureau of Investigation,".

The CHAIRMAN. The gentleman from Illinois (Mr. DERWINSKI) still has the floor.

Mr. DERWINSKI. Mr. Chairman, in order to expedite the procedure, I will yield back the balance of my time, so that the gentleman from Arizona (Mr. UDALL) can explain his amendments.

The CHAIRMAN. Does the gentleman from Arizona (Mr. UDALL) wish to be heard on his amendment?

Mr. UDALL. Mr. Chairman, for the time being, I shall reserve my time.

Mr. LIVINGSTON. Mr. Chairman, I move to strike the requisite number of words.

Mr. Chairman, I rise in support of the amendments offered by the gentleman from Texas which would exempt the FBI from coverage under titles I, IV and VI of the Civil Service Reform Act.

Enactment of H.R. 11280, as written now, could effectively deprive the Director of the FBI of his prerogative to control all phases of personnel administration. Traditionally, this authority, which would be lost under title I, has been one of the keystones of the Bureau's semiautonomous status and has provided insulation from improper external influences into matters which could compromise classified information or sensitive operations.

With the creation of the senior executive service under title IV, one can easily imagine the consequences of other agencies' officials, previously unexposed to the broad scope of criminal law enforcement, who would be entrusted with new responsibility for its leadership in the Bureau executive system.

Inclusion of the FBI under title VI would seriously threaten the impartiality of investigations the Bureau is mandated to conduct with regard to violations of criminal statutes dealing with official and political corruption.

Mr. Chairman, there can be no credible argument in favor of inclusion of the FBI in the present bill. The FBI ranks as one of the agencies in the Government most subject to oversight. It must make regular reports to six committees of Congress—Senate and House Judiciary, Intelligence and Appropriations—and is subject to oversight by the Department of Justice, the General Accounting Office and the Office of Management and Budget.

Finally, failing to exempt the FBI, like all other security agencies, from these three titles of the bill, could mean the end of the FBI as we know it—a centrally administered, tightly disciplined, responsive career law enforcement agency. Such action would create just one more agency, subject to the traditionally inefficient bureaucratic mechanisms.

Mr. Chairman, I urge this body to agree to the amendments. Possibly, if we can reach an amicable compromise through the efforts of the gentleman from Arizona, I would like to join in those efforts. I would like to see how the ultimate compromise comes down, but in the meantime I would be happy to yield to the gentleman from Texas (Mr. COLLINS) for his comments.

Mr. COLLINS of Texas. Mr. Chairman, at this time I would like to offer an amendment to the substitute amendments offered by the gentleman from Arizona (Mr. UDALL).

The CHAIRMAN. The gentleman from Texas (Mr. COLLINS) is advised that the gentleman from Louisiana cannot yield for the purpose of offering an amendment. He can yield time for debate.

Mr. LIVINGSTON. Mr. Chairman, I yield back the balance of my time.

AMENDMENT OFFERED BY MR. COLLINS OF TEXAS TO THE AMENDMENTS OFFERED BY MR. UDALL AS A SUBSTITUTE FOR THE AMENDMENTS OFFERED BY MR. COLLINS OF TEXAS

Mr. COLLINS of Texas. Mr. Chairman, I offer an amendment to the amendments offered as a substitute for the amendments.

The Clerk read as follows:

Amendment offered by Mr. COLLINS of Texas to the amendments offered by Mr. UDALL as a substitute for the amendments offered by Mr. COLLINS of Texas:

On page 141, line 20, after "(c)" inserts "(1)"; on page 142 after line 3, insert the following:

On page 142 after line 22 insert:

"(2) In the case of employees and applicants for employment in the Federal Bureau of Investigation, disclosures described in subsection (b)(8)(A) of this section shall be made to the Attorney General or his designee. The Attorney General of the United States shall issue rules and regulations to protect employees and applicants for employment in the Federal Bureau of Investigation from the taking or failure to take any personnel action as a reprisal for such disclosure.

The CHAIRMAN. The gentleman from Texas (Mr. COLLINS) is recognized.

Mr. UDALL. Mr. Chairman, will the gentleman yield?

Mr. COLLINS of Texas. I will be glad to yield to the gentleman from Arizona.

Mr. UDALL. Mr. Chairman, this amendment to my substitute is perfectly acceptable. It carries out the intent of what the gentleman from Texas was trying to do earlier.

So, if we will adopt the Collins amendment to the Udall substitute, and adopt the Udall substitute, we will have this compromise worked out.

Mr. COLLINS of Texas. Let me ask one question: It is my understanding that the President, when he wants to use this authority would go to the Attorney General. That would be the person he would turn to to follow up on this?

Mr. UDALL. The President will be empowered to set up a separate system, and under the gentleman's amendment to my substitute it would be required that it go through the Attorney General.

Mr. LEVITAS. Mr. Chairman, will the gentleman yield?

Mr. COLLINS of Texas. I yield to my colleague from Georgia.

Mr. LEVITAS. Mr. Chairman, I thank the gentleman for yielding to me. First of all, I would like to commend the gentleman from Texas (Mr. COLLINS) on the leadership he has taken in this regard.

I have one question. I think it is impor-

tant to clarify through the chairman, the gentleman from Arizona, with respect to the language contained in the first part of his amendment to which the gentleman from Texas has offered an amendment. Under this language, would it be possible for the President to designate, as his designee, the special counsel otherwise created in this legislation for purposes of investigation in an FBI matter? Because, if that is the case, it would seem to me to defeat the purpose of the Collins amendment.

Mr. UDALL. Mr. Chairman, if the gentleman will yield, it is very clear. The Collins amendment to my amendment states that it is ordered by the Congress that he not do it this way, that he work through the Attorney General. The President is given pretty broad powers, but I cannot imagine that he would go to the special counsel with this history we have made here today.

Mr. LEVITAS. I thank the chairman for that clarification. I think that does relieve not only myself, but others on these concerns, because I think the legislation is quite clear that the special counsel created by this legislation would not be the vehicle through which these matters would be pursued. I think it is very important because without this clarification, the FBI would be treated substantially different in the sensitive areas from the other intelligence agencies.

Mr. UDALL. The gentleman from Georgia has accurately stated what I am trying to do in this compromise.

Mr. MAZZOLI. Mr. Chairman, will the gentleman yield?

Mr. COLLINS of Texas. I yield to the gentleman from Kentucky.

Mr. MAZZOLI. Mr. Chairman, I would ask of the gentleman from Texas, and through him the chairman of the committee, whether or not the amendment that is proposed by the gentleman from Arizona, as proposed to be amended by the gentleman from Texas, is the essence of agreements and understandings made with the chairman of the House Intelligence Committee, the gentleman from Massachusetts (Mr. BOLAND), whom I do not see on the floor today.

I would ask the gentleman from Arizona, as I just asked the gentleman from Texas, whether or not the substitute proposed by the gentleman from Arizona to be further amended by the amendment offered by the gentleman from Texas, incorporates the agreements or understandings or discussions had with Chairman BOLAND of the House Intelligence Committee?

Mr. UDALL. If the gentleman will yield, here we are dealing with another matter. That is a different matter. I have worked out an amendment with the gentleman from Massachusetts (Mr. BOLAND) which I will accept later in the proceedings on that matter.

Mr. MAZZOLI. I thank the gentleman from Arizona.

Mr. COLLINS of Texas. Mr. Chairman, I think we now have an understanding that questions will go through the Attorney General and the FBI, and I would accept the substitute with the amendment.

Mr. UDALL. Mr. Chairman, the staff tells me the Collins amendment to the Udall amendments has not been placed properly in the bill.

I would ask unanimous consent that the Collins amendment to the Udall substitute amendments be clarified as to its place in the bill as identified in the amendment at the desk.

The CHAIRMAN. The Clerk will report the modification.

The Clerk read as follows:

On page 141, line 20, after "(c)" insert "(1)";
On page 142, after line 3, insert the following:
"(2) In the case of employees and applicants for employment in the Federal Bureau of Investigations, disclosures described in subsection (b)(8)(A) of this section shall be made to the Attorney General or his designee. The Attorney General of the United States shall issue rules and regulations to protect employees and applicants for employment in the Federal Bureau of Investigation from the taking or failure to take any personnel action as a reprisal for such disclosure.

The CHAIRMAN. Is there objection to the request of the gentleman from Arizona to modify the amendment?

There was no objection.

The CHAIRMAN. The question is on the amendment offered by the gentleman from Texas (Mr. COLLINS), as modified, to the amendments offered by the gentleman from Arizona (Mr. UDALL) as a substitute for the amendments offered by the gentleman from Texas (Mr. COLLINS).

The amendment, as modified, to the amendments offered as a substitute for the amendments was agreed to.

The CHAIRMAN. The question is on the amendments, as amended, offered by the gentleman from Arizona (Mr. UDALL) as a substitute for the amendments offered by the gentleman from Texas (Mr. COLLINS).

The amendments, as amended, offered as a substitute for the amendments were agreed to.

The CHAIRMAN. The question is on the amendments offered by the gentleman from Texas (Mr. COLLINS), as amended.

The amendments, as amended, were agreed to.

AMENDMENT OFFERED BY MR. HARRIS

Mr. HARRIS. Mr. Chairman, I offer an amendment.

The Clerk read as follows:

Amendment offered by Mr. HARRIS: Page 141, line 20, insert "(1)" after "(c)".
Page 142, after line 3, insert the following:
"(2)(A) The head of each agency shall establish a personnel office and appoint an individual to be the head of such office.
"(B) The position to which any individual is appointed under subparagraph (A) of this paragraph shall, notwithstanding any other provision of law, be a position within the competitive service or a career reserved position within the Senior Executive Service. The requirement of the preceding sentence shall not apply if a majority of the civil service positions within such agency are excepted from the competitive service by or under any law (other than this title).

Mr. HARRIS (during the reading). Mr. Chairman, I ask unanimous consent that the amendment be considered as read, and printed in the RECORD.

The CHAIRMAN. Is there objection to the request of the gentleman from Virginia?

There was no objection.

Mr. HARRIS. Mr. Chairman, this is a simple amendment, but I think a very important amendment. One of the biggest fears that is in the minds of many Federal employees today is to what extent we allow this bill to politicize the system. I think the flexibility we have talked about and the modernization we have talked about is supported by the average citizen and Federal employees alike. What they fear is who is going to implement these merit principles that are so finely pronounced in title I. What this amendment does is say that we will have in fact a personnel director that is not a political appointee. It is a competitive merit system person himself or herself who will be responsible for implementing these principles.

I would point out to my colleagues that under the bill we do centralize a great deal of the responsibility with respect to guarding the merit system principles and hiring principles enunciated in title I. No longer will we have a centralized bureau like the Civil Service Commission that will have total responsibility of making sure that merit system principles are adhered to.

There is provision in the bill to delegate this responsibility to individual agencies. I think we have had the experience in the past of agency heads saying they were not responsible for implementing it, it was the job of the Civil Service Commission, and so forth. Perhaps this delegation is a good idea, but only if we are sure who has the responsibility within each agency to guard against the politicization of the system and make sure that these merit principles are adhered to.

This amendment does one thing, somebody in that agency is a personnel officer where that agency is composed mostly of competitive people, to make sure that this person is a career person and not a political appointee.

I think it is one small step toward guarding against the appearance of, and the actuality of, in many cases, of politicizing the system, and will be a major reform in the bill as it is.

I would hope my colleagues can consider this favorably. I think it establishes a very important element with regard to a reform measure by saying simply that within each agency there is somebody responsible for safeguarding these merit principles we are enunciating, and, No. 2, that that person is not a political appointee and that person has knowledge of and understands the merit principles.

Mr. GILMAN. Mr. Chairman, will the gentleman yield?

Mr. HARRIS. I yield to the gentleman from New York.

Mr. GILMAN. Mr. Chairman, I thank the gentleman from Virginia (Mr. HARRIS) for yielding to me.

Mr. Chairman, I rise to applaud the efforts of the gentleman from Virginia (Mr. HARRIS) and endorse the goal that he seeks.

to take about a year to 15 months to set up the system. We are trying to attract into it the permanent career people, and we are telling them to cut their moorings, leave all they have and join this exciting new innovative service, and the whole thing is going to go down the drain in 2 years.

It will take at least 4 or 5 years to give this a fair trial. We went along in committee with a somewhat similar amendment offered by Mrs. SPELLMAN. This, in my judgment, destroys it. There would be no chance of getting the kind of people we want in the Senior Executive Service if it is a 2-year trial. It would hardly be on the way.

The CHAIRMAN. The question is on the amendment offered by the gentleman from Maryland (Mr. STEERS).

The amendment was rejected.

AMENDMENT OFFERED BY MR. COLLINS OF TEXAS

Mr. COLLINS of Texas. Mr. Chairman, I offer an amendment.

The Clerk read as follows:

Amendment offered by Mr. COLLINS of Texas: On page 258, line 7: strike out 10,920 and insert in lieu thereof "10,780".

On page 258, line 13: strike out "Management" and insert in lieu thereof the following: "Management, except that the Director of the Federal Bureau of Investigation, without regard to any other provision of this section, may place a total of 140 positions in the Federal Bureau of Investigation in GS-16, GS-17 and GS-18."

Mr. COLLINS of Texas. Mr. Chairman, I submit this amendment with Mr. LEVITAS of Georgia and Mr. VOLKMER of Missouri.

By reason of its unique responsibilities, the FBI has historically been afforded a measure of exemption from overview of the Civil Service Commission regarding personnel policies and authorizations. At present the FBI and all positions therein are in the excepted service (title 28 U.S.C. 536) and the Director is authorized to place up to 140 positions in the Bureau into grades GS-16, GS-17 and GS-18 (title 18 U.S.C. 5108 c2). Further, it has been the policy of the Department of Justice that the Director have complete latitude in managing the personnel policies and functions of the Bureau below the rank of Assistant Director, subject only to postaudit and correction by the Assistant Attorney General for Administration (title 28 CFR X, 0.137).

The effect of the FBI's excepted status is to remove it from the purview of the Civil Service Commission in such areas as recruitment, qualification standards, promotional requirements, internal placement, career and career-conditional employment, and temporary assignments. The authorization afforded to the Director to manage the executive manpower of the FBI, its supergrade employees, is central to this degree of independence. It insures that the FBI may respond in a prompt, flexible, and unfettered manner to the investigative priorities provided it by the Attorney General without need to obtain concurrence of other agencies or authorities.

Given the demanding, sensitive, and unique responsibilities of the FBI, particularly its role as the primary investigative arm of the Department of Justice, there is ample rationale for providing it as great a degree of insulation with regard to its personnel function as is practical. This consideration is most important when consideration is afforded the role of the FBI as the Department of Justice's primary investigative arm for 78 public integrity violations of the criminal statutes of the United States.

Since these violations, by definition, involve misconduct on the part of officials of the U.S. Government the most prudent course for the future would appear to be to insure that the FBI is not dependent upon other agencies in such important matters as executive staffing levels. To do otherwise detracts from the ability of the Attorney General to fully utilize the investigative capabilities of the FBI in a manner he believes best serves the interests of the United States.

This amendment is fair and consistent. It places the FBI on the same basis as the CIA, the National Security Agency, Defense Intelligence, and the GAO. For our national security, I ask your full support for the FBI amendment.

Mr. UDALL. Mr. Chairman, I rise in opposition to the amendment.

Mr. Chairman, the FBI is a good organization, a good professional organization, and it has been beleaguered in recent years. I know many Members have been concerned about it and many people have been lobbied by the FBI and their friends on these amendments.

I was determined today in this debate that nobody was going to have any legitimate ground to complain that the FBI had not been given everything they were entitled to and had been given all the exemptions they needed to perform their mission.

This morning I accepted an amendment that gave the FBI, I thought, everything they could ask for within reason. The FBI has been totally exempted from the Senior Executive Service and they have been given a total exemption from title VI, which had concerned them about demonstration practices and experimental efforts. We gave the President authority to exempt them from the standard personnel practices and standard provisions of the Personnel Act, and the President will exercise that.

We gave them the special authority this morning, in an amendment I agreed to, to let the President set up their own whistle-blower system so that appeals would not be to the outside but to the Attorney General.

Now they want it all. I do not think they are entitled to this amendment.

What are we talking about here? We are talking about supergrades. One of the worst things that has happened in the last few years is the end runs around the supergrade pool. The idea was to have one supergrade pool for all Government, and when an agency completes its mission and may not need all the supergrades it had, then those executives would transfer to another agency. Or an agency may need an increase. They could move them around. But what has happened is this. If we were dealing, for instance, with the Park Service, we would say to them that notwithstanding the pool they get 140 supergrades in this service here.

Then the next agency would come in, NIH, the Smithsonian, or the Labor Department, and they will all want their own little pools.

Today about 80 percent of the supergrade positions are outside the pool and the pool is really a joke because under existing law we give special exemptions to the FBI, to the GAO, the Library of Congress, the Secretary of Defense, the Immigration Service, NASA, Bureau of Prisons, Railroad Retirement, OSHA, the Law Enforcement Administration, the Tax Court, IRS, EEOC, they all have their own little supergrade pool.

So the bill before us would abolish all of them and we would just have one governmentwide pool. Each one of the agencies will come in, and they will say here is what we need. Then the Office of Personnel Management will evaluate the need.

But now, in this amendment, it is proposed that we give the FBI a special pool of 140 supergrades, and as of now, they will be the only agency in the whole bill that has been separately singled out, and the Members will say why single the FBI out, why not the defense agencies, the Defense Department and everybody else? They will all be in one separate pool, but the FBI will be treated separately.

So, I repeat, if we accept this amendment, I guarantee that before the evening is out, I think that every one of you will be on your feet trying to single another agency out because there is not a Member in the whole House who does not have his own special agency and who thinks they ought to have their own pool, forever and ever, world without end, amen.

So, if we are going to do this and get this problem settled, then let us do it right, and let us not start eroding it with the FBI, let us start out with a supergrade Government-wide overall pool, and with all of the agencies and their supergrades treated alike.

We have done that in this bill. I repeat, let us start with a good supergrade proposal. But, if we start out by singling out one particular department, and get that chain in the door, then we will not be able to stop the flood.

Mr. VOLKMER. Mr. Chairman, I rise in support of the amendment offered by the gentleman from Texas (Mr. COLLINS).

Mr. Chairman and members of the committee, I do not plan to take the full 5 minutes in support of this amendment, however, as one who has tried to keep up with this legislation because of its known importance to this Nation and make it possible to restore public confidence in our National Government, and the operation of that Government by the separate individuals in it, and also to get better and still better operations through our public employees, and our Federal Government, as I say. I have tried to keep up with it, and specifically in this one area, and I have done so because I have been a member of the subcommittee that also has jurisdiction and oversight of this

agency, and also as one who has been involved in law enforcement, I have a great feeling for this agency. I realize that this agency must remain independent.

I must disagree with the gentleman from Arizona in that respect, and, in my opinion, if this amendment is not adopted, there will be a backing away from the independence of the FBI and thus cause harm to the criminal law enforcement in our Federal Government. I say that because the FBI is the one that investigates all of the other agencies of the Federal Government such as we have right now going on with the GSA.

It is the one agency that investigates the wrongdoings in the Federal Government, the white-collar crimes. If such a thing would occur, let us say, within the Civil Service Commission itself, then it would be investigated by the FBI. So, in my opinion, this could jeopardize that agency.

Mr. UDALL. Mr. Chairman, will the gentleman yield?

Mr. VOLKMER Yes, I yield to the gentleman from Arizona.

Mr. UDALL. Mr. Chairman, I agree with everything that the gentleman is saying about the special role of the FBI. It is a good, honest agency, and I will praise it and I will defend it, but why, can the gentleman give me one reason why this agency out of all of the other agencies, not even the defense departments, not OSHA, not NASA, should have its own separate pool of supergrades? Why should this one agency be treated differently?

Mr. VOLKMER. That is because they are the agency that does the investigating of wrongdoings within the Federal Government.

Mr. UDALL. But what does the number of supergrades in that agency have to do with its ability to investigate wrongdoings?

Mr. VOLKMER. So that it will not depend on any other agency which it may have to investigate, including the Civil Service Commission.

I had been informed, and as a result of what happened this morning, I had discussed this matter with the man on the staff of the gentleman from Arizona, the man sitting next to him during the debate on that substitute, because I was concerned specifically about this point.

It was my understanding this morning when it was first brought up it included this provision. It was not until after that was all done that I determined that it did not, and I was greatly upset about it.

I had discussed it with our Attorney General. He is greatly upset about it, about the fact that this is not included.

I discussed it today with him. I have also been informed by another source, which I feel to be very reliable, that the Chairman of the Civil Service Commission has no objection to this amendment.

Mr. FORD of Michigan. Mr. Chairman, will the gentleman yield?

Mr. VOLKMER. I yield to the gentleman from Michigan.

Mr. FORD of Michigan. Mr. Chairman, I just came back on the floor. I am shocked.

Is the gentleman saying that Attorney General Griffin Bell discussed with him amendments to the President's civil service reform bill?

Mr. VOLKMER. I will emphatically say yes, y-e-s.

Mr. FORD of Michigan. Is the gentleman saying that the Attorney General is lobbying amendments into this bill?

Mr. VOLKMER. No, I am not saying that he is lobbying at all. I called him up. We discussed it among other things in which I am interested.

Mr. FORD of Michigan. The gentleman said that he is upset about the contents of the amendment this morning?

Mr. VOLKMER. Yes, because this was not included. I thought it was.

I talked to the staff man of the gentleman from Arizona. He is sitting right next to him. There was a misunderstanding there because when the gentleman answered me, at my request—and I am not blaming him—there was a misunderstanding. When he spoke to me he said it was the same as in the bill. It was my understanding that it was the same as in the present law.

Mr. UDALL. Mr. Chairman, will the gentleman yield?

Mr. VOLKMER. I yield to the gentleman from Arizona.

Mr. UDALL. Mr. Chairman, there was an obvious misunderstanding.

I gave them everything they want, their independence and their exemptions from the system. What I cannot understand is of all of these dozens of agencies in the Government, this one agency has to have supergrades when we are trying to set up a system under which no one has.

Mr. VOLKMER. It is so that it remains solely independent as a law enforcement agency, as it should.

Mr. GOLDWATER. Mr. Chairman, I move to strike the requisite number of words, and I rise in support of the amendment.

I think there is ample precedent here to exclude the FBI from this provision, especially in the higher grades we are talking about.

The FBI has a very unique mission with respect to law enforcement. These individuals are not just civil servants. They are very specialized. They are very narrowly categorized. They require a very special kind of training, and their mission is of the highest order. Certainly their responsibility and authority are important activities which we are dependent upon, not only for our security, but also for internal vigilance.

Mr. Chairman, it just seems to me that it makes a lot of commonsense that if we are going to continue the type of organization which we expect the FBI to be, that agency should have full control and authority over the type of personnel whom they are going to be relying upon for life and death and the security of this country and certainly for the internal vigilance which we expect. It just seems to me that this makes a lot of commonsense. I think we ought to support the amendment.

Mr. UDALL. Mr. Chairman, will the gentleman yield?

Mr. GOLDWATER. I yield to the gentleman from Arizona.

Mr. UDALL. Mr. Chairman, may I pose this question: What do I say and how is the gentleman going to vote when the gentleman from Oregon wants to give the Forest Service its pool of supergrades?

The gentleman from California contacted me last week. He is on the board of the Smithsonian, and they want their own pool. What am I going to say to the CIA when somebody from the Committee on Intelligence gets up tonight and says that they are a special agency and they want their own allocation?

Will the gentleman join me in voting for all those amendments, or does he think the FBI is a special agency and it alone has to have a carved-out pool of supergrades?

Mr. GOLDWATER. I would agree with the gentleman in saying that the FBI is unique in the mission which they are set up to do.

Mr. UDALL. Does the accomplishment of the mission of the FBI depend on whether the President says they can get by with 135 supergrades or whether they have to have 140?

Why should this one agency alone, in the accomplishment of its mission, be dependent on having this number carved out for it, world without end, with no limit on it?

Mr. GOLDWATER. I would suggest to my friend, the gentleman from Arizona, that this agency's mission is of the highest priority as far as national security, as far as internal vigilance, and as far as law enforcement is concerned. It is a prime and singular agency. It does nothing else but pursue that particular mission.

Mr. UDALL. How is the accomplishment of that mission dependent upon the number of supergrades it has?

Mr. GOLDWATER. It depends on the quantity and the quality of personnel. I think that is that we are talking about here, and I think only those who have that responsibility of directing the FBI and its people really know and understand what is needed in this area. I think it is going to be completely confusing if we interject another sector such as OPA into it. I urge support of the amendment.

Mr. DERWINSKI. Mr. Chairman, I move to strike the requisite number of words.

I have a feeling that this debate is getting totally out of control in the sense of our all appreciating precisely what the amendment does and precisely what classifications of positions are involved.

The gentleman from Arizona (Mr. UDALL) has properly ponted out that heretofore every committee, every subcommittee, has played around like little crown princes knighting people and sending then off as supergrades. As a result, all through Government in every appropriation and authorization bill we are creating supergrades. Nobody has a hold on them—not even the President or the Office of Management and Budget—nobody. So what we have got in this bill is an attempt to pull them all together.

As I understand the supporters of the amendment, they seem to feel that we are going to put 140 misfits into the FBI. That is not the case at all. All that is going to happen is that the FBI under this reformed structure will in fact request the number of supergrade slots it wishes to have designated. They will be FBI agents, the agents in charge, for example, in the major cities, and we are not going to send a diet technician from Walter Reed Hospital to be the agent in charge of Phoenix, Ariz. He will be a career FBI law enforcement officer there. So the Members are reading into this a lot of things that are not there. But the point the gentleman from Arizona (Mr. UDALL) has made is one we should all follow. For example, our friend, the gentleman from Oregon, is going to take care of the Forest Service. Then there might be those Members who are interested in protecting the chief judge of the U.S. Tax Court. He has five supergrades. Why not let the chief judge rather than his pool handle that? What about the Commodity Futures Trading Commission? That is one of our newest little bureaucracies. They have 20 supergrades. Why should they not be excluded, and just have the farm interests? We go on and on and on.

So I would suggest the point the gentleman from Arizona (Mr. UDALL) is making is a sound one. What we have here is legitimate control of total numbers. The allocation will be practical. The allocation will take into account the expertise needed in the departments, and in the case of the FBI we are going to have the FBI in effect redesignate—and it is 140 or even more, if they can justify it—and they are not going to be square pegs in round holes. They are going to be good, loyal law enforcement officers, and the fear that somehow the FBI is going to be directed or administered by a bunch of locomotive engineers, not all law enforcement officers, just is not the case.

I appreciate the superconcern about the FBI. I do not want the FBI politicized. I do not want the FBI mishandled. I do not want it criticized, but I think we have greatly exaggerated the presumed danger of the FBI in the arguments against the position the gentleman from Arizona (Mr. UDALL) enunciated.

Mr. COLLINS of Texas. Mr. Chairman, will the gentleman yield?

Mr. DERWINSKI. I yield to the gentleman from Texas.

Mr. COLLINS of Texas. I thank the gentleman for yielding.

On page 213, just for clarification, it has been said that only the FBI is concerned. On the top of page 213 it refers to the exclusion. It sets up the terms, definitions, and exclusions, and it says the Central Intelligence Agency, the Defense Intelligence Agency, and the National Security Agency. They talk about the security agencies.

Mr. UDALL. Mr. Chairman, will the gentleman yield to me?

Mr. DERWINSKI. I yield to the gentleman from Arizona.

Mr. UDALL. I thank the gentleman for yielding.

The gentleman from Texas (Mr. COLLINS) is making my precise point. In the bill as it came out of the committee we excluded the CIA. We said they are not even in the Senior Executive Service. This morning we did that for the FBI. We gave them complete exclusion from the SES. We excluded them from titles I and II. We took them out of the whistle-blower, and the only thing left here is whether they are going to have carved out a specific number of supergrades that will go to the President, and the pool will get all they need. But they should not be singled out forever to have an allocation. The thing the gentleman is talking about was taken care of in the amendment this morning. The FBI is the same as the CIA.

Mr. COLLINS of Texas. If the gentleman from Illinois would yield further to me, is the gentleman telling me in these categories they have no supergrades at all in any of these agencies?

Mr. UDALL. Nobody would have an allocated permanent pool of supergrades under this rule, and we are trying to hold that line.

Mr. DERWINSKI. What we are speaking of here is the Senior Executive Service. The Senior Executive Service will not be running the FBI.

The CHAIRMAN. The question is on the amendment offered by the gentleman from Texas (Mr. COLLINS).

The question was taken; and the Chairman announced that the noes appeared to have it.

Mr. COLLINS of Texas. Mr. Chairman, I demand a recorded vote, and pending that, I make the point of order that a quorum is not present.

The CHAIRMAN. Evidently a quorum is not present.

The Chair announces that pursuant to clause 2, rule XXIII, he will vacate proceedings under the call when a quorum of the Committee of the Whole appears.

Members will record their presence by electronic device.

The call was taken by electronic device.

QUORUM CALL VACATED

The CHAIRMAN. One hundred Members have appeared. A quorum of the Committee of the Whole is present. Pursuant to rule XXIII, clause 2, further proceedings under the call shall be considered as vacated.

The Committee will resume its business.

RECORDED VOTE

The CHAIRMAN. The pending business is the demand of the gentleman from Texas (Mr. COLLINS) for a recorded vote.

A recorded vote was ordered.

The vote was taken by electronic device, and there were—ayes 124, noes 217, answered "present" 1, not voting 90, as follows:

[Roll No. 750]

AYES—124

Alexander
Andrews, N. Dak.
Annunzio
Applegate
Archer
Ashbrook
Badham
Bafalis
Barnard
Bauman
Beard, Tenn.
Bowen
Brinkley
Broomfield
Broyhill
Buchanan
Burke, Mass.
Butler
Carter
Cederberg
Clausen, Don H.
Cleveland
Coleman
Collins, Tex.
Crane
Cunningham
Daniel, Dan
Daniel, R. W.
Dent
Devine
Dornan
Duncan, Tenn.
Edwards, Okla.
English
Fountain
Fowler
Frenzel
Gaydos
Gephardt
Gilman
Ginn
Goldwater
Gradison
Gudger
Guyer
Hall
Hammerschmidt
Harris
Harsha
Hillis
Hubbard
Hyde
Ichord
Johnson, Calif.
Jones, N.C.
Kelly
Kindness
Lagomarsino
Leach
Lederer
Lent
Levitas
Livingston
Lloyd, Calif.
Lloyd, Tenn.
Lott
McClory
McDonald
McEwen
Madigan
Marriott
Martin
Mathis
Miller, Ohio
Minish
Mitchell, N.Y.
Mollohan
Montgomery
Moore
Mottl
Murtha
Myers, Gary
Myers, John
Neal
O'Brien
Quillen
Regula
Roberts
Robinson
Rooney
Rose
Runnels
Ruppe
Satterfield
Schulze
Shuster
Sikes
Skelton
Slack
Smith, Iowa
Snyder
Spellman
Spence
Stangeland
Stanton
Steers
Steiger
Symms
Taylor
Treen
Tucker
Vanik
Volkmer
Waggonner
Walsh
Wampler
Watkins
Wolff
Wydler
Wylie
Yatron
Young, Fla.
Young, Mo.
Zablocki

NOES—217

Abdnor
Akaka
Ambro
Anderson, Calif.
Anderson, Ill.
Andrews, N.C.
Ashley
Aspin
AuCoin
Baldus
Baucus
Beard, R.I.
Bedell
Beilenson
Benjamin
Bennett
Bevill
Blanchard
Blouin
Boggs
Bolling
Bonior
Brademas
Breckinridge
Brodhead
Brooks
Brown, Calif.
Burlison, Mo.
Burton, John
Caputo
Carney
Carr
Clay
Collins, Ill.
Conable
Conte
Corman
Cornell
Cornwell
Cotter
Coughlin
D'Amours
Danielson
Davis
de la Garza
Dellums
Derrick
Derwinski
Dicks
Dingell
Dodd
Downey
Drinan
Duncan, Oreg.
Early
Edgar
Edwards, Ala.
Edwards, Calif.
Eilberg
Erlenborn
Ertel
Evans, Ga.
Evans, Ind.
Fascell
Fenwick
Findley
Fisher
Fithian
Flippo
Florio
Foley
Ford, Mich.
Ford, Tenn.
Gammage
Garcia
Giaimo
Glickman
Goodling
Gore
Grassley
Green
Hamilton
Hannaford
Harkin
Hawkins
Heckler
Hefner
Heftel
Hightower
Holland
Hollenbeck
Holtzman
Horton
Howard
Hughes
Jacobs
Jeffords
Jenrette
Jones, Okla.
Jones, Tenn.
Jordan
Kastenmeier
Kazen
Keys
Kildee
Kostmayer
Krebs
LaFalce
Le Fante
Leggett
Long, La.
Long, Md.
Luken
Lundine
McCloskey
McCormack
McDade
McFall
McHugh
McKay
McKinney
Maguire
Mahon
Mann
Markey
Marks
Marlenee
Mattox
Mazzoli
Meeds
Metcalfe
Meyner
Michel
Mikulski
Milford
Mineta
Moakley
Moorhead, Pa.
Murphy, Ill.
Murphy, N.Y.
Murphy, Pa.
Myers, Michael
Natcher
Nedzi
Nichols
Nix
Nolan
Nowak
Oakar
Oberstar
Obey
Ottinger
Panetta
Patten
Patterson
Pattison
Pease
Pepper
Perkins
Pickle
Pike
Poage
Pressler
Preyer
Price
Pritchard
Pursell
Quayle
Rahall
Railsback
Reuss
Rhodes
Roe
Rogers
Roncalio
Rosenthal
Rostenkowski
Roybal
Russo
Santini
Sawyer
Scheuer
Schroeder
Sebelius
Seiberling
Sharp
Simon
Skubitz
Solarz
Staggers
Stark
Steed
Stockman
Stokes
Studds
Thompson
Thone
Thornton
Trible
Udall

HeinOnline -- 124 Cong. Rec. 28772 1978